**In the Matter of Jackie Allen ENDICOTT and Patricia Ann Endicott, Debtors.**

**Civ. A. No. 92–0143–B.**

United States District Court,
W.D. Virginia,
Big Stone Gap Division.

April 21, 1993.

Opinion on Rehearing
July 23, 1993.

Michael L. Shortridge, Norton, VA, for plaintiff.

Thomas C. Antenucci, Abingdon, VA, for defendants.

Jo S. Wick, U.S. Bankruptcy Trustee.

## MEMORANDUM OPINION

GLEN M. WILLIAMS, Senior District Judge.

Grundy National Bank (the Bank) appeals the bankruptcy court's confirmation of a Chapter 13 plan proposed by Jackie Allen Endicott and Patricia Ann Endicott (the Debtors). Jo S. Wick, United States Bankruptcy Trustee (the Trustee) represented the bankruptcy estate. Jurisdiction lies in this Court pursuant to 28 U.S.C. § 158. This case is remanded to the bankruptcy court for further hearings in accordance with this Memorandum Opinion.

## FACTS

In August 1990, Jackie Endicott, a truck driver, decided to start his own business. To finance the venture, he and his wife, Patricia, borrowed $45,825.40 [1] at 11.82% annual interest from Grundy National Bank. The Debtors' mobile home and the real estate it rested on served as collateral for the loan. The loan note called for monthly payments of $520.84; the Debtors were to pay a balloon payment of $42,-069.87 after three years on August 29, 1993.

The Debtors were unsuccessful in starting their own trucking business; the truck was wrecked, and the Debtors had trouble collecting insurance. Soon they were at least three months and $2,604.20 in arrears on their loan payments. The Bank threatened foreclosure. As a result, the Debtors filed for Chapter 13 bankruptcy on February 24, 1992. The Bank filed a secured claim for $44,593.81 (including a $3,583.36 arrearage).[2] In the documents they filed with the bankruptcy court, the Debtors' interest in the collateral is listed as $42,-500.00; the market value is listed as $41,-000.00.

On July 28, 1992, the bankruptcy court held a confirmation hearing on the amended bankruptcy plan, and on July 30, 1992, the court issued a written opinion supporting plan confirmation. In the opinion, the bankruptcy court asked the United States Trustee to propose a confirmation order "in accordance with the within Memorandum Opinion." On August 21, 1992, the United States Trustee submitted a proposed confirmation order and the bankruptcy judge signed it on August 25, 1992.

---

1. In the bankruptcy court's Memorandum Opinion of July 30, 1992, the amount owed by the debtors is listed as $45,824.40. However, both the appellants and the appellees state that Debtors borrowed $45,825.40.

2. The Bank also filed an unsecured claim for $546.44, not at issue in this case.

The confirmed bankruptcy plan required that the Debtors pay $531.57 each month at 10% annual interest for five years. The last payment would be a balloon payment of $31,864.34. The Bank retains its liens on the property, which is fully insured.

The Bank now suggests several reasons for this Court to reverse the bankruptcy court's Order of Confirmation. First, the Bank requests that the Order of Confirmation be vacated due to impermissible ex parte communications between the Trustee and the bankruptcy court; the Bank claims it never received copies of the Trustee's proposed order, and was never notified by the bankruptcy court that the order was being considered. Second, the Bank argues that the bankruptcy court could not lower the contract interest rate of the Bank's claim as part of the bankruptcy plan, because this would prevent the Bank from recovering its allowed secured claim in full. Third, the Bank asserts that the plan should not have been confirmed because it does not cure the arrearage. Fourth, the Bank alleges that the plan violates 11 U.S.C. § 1322(c), which requires that good cause be shown in order to extend a bankruptcy plan beyond three years. Fifth, the Bank contends that the bankruptcy plan violates § 1322(c)'s five-year maximum limitation on Chapter 13 plans. Sixth, the Bank argues that because of a large balloon payment, the bankruptcy plan is not feasible; and seventh, the Bank claims that the Debtors did not offer the plan in good faith.

The Debtors argue that the plan is feasible and was proposed in good faith and that the bankruptcy court did not abuse its discretion in confirming their Chapter 13 bankruptcy plan.

This case is remanded to the bankruptcy court on the issues of feasibility and good faith in accordance with this Memorandum Opinion. For the reasons set forth herein, this Court denies the Bank's request for revocation of the Order of Confirmation due to alleged ex parte communications.

## ANALYSIS

### I. Standard of Review

■ In appeals from bankruptcy court, a district court may overturn a bankruptcy court's findings of fact only if they are clearly erroneous. Fed.Bankr.R. 8013. Purely legal issues are reviewed de novo, and mixed questions of fact and law are examined for clear error. *Tepper v. Chichester*, 285 F.2d 309, 312 (9th Cir.1960).

■ Ordinarily, this Court will not review a matter on appeal if the issue was not presented to the bankruptcy court; such issues are considered waived by the complaining party. *In re Kroner*, 953 F.2d 317, 319 (7th Cir.1992); *see In re Arnold*, 869 F.2d 240, 244 (4th Cir.1989).[3] However, in exceptional circumstances, a district court may decide an issue not raised in the lower court, particularly if the record is clear on the matter. *Kroner*, 953 F.2d at 319; *see In re Air Conditioning, Inc.*, 845 F.2d 293, 299 (11th Cir.), *cert. denied, First Interstate Credit Alliance Inc. v. American Bank of Martin County*, 488 U.S. 993, 109 S.Ct. 557, 102 L.Ed.2d 584 (1988).

---

**3.** While the Seventh Circuit has decided that district courts may not review issues not raised in the bankruptcy court except in unusual circumstances, *Kroner*, 953 F.2d at 319, the Ninth Circuit has held that a district court has the power and the discretion to decide any matter raised for the first time on appeal. *In re E.R. Fegert, Inc.*, 887 F.2d 955, 957 (9th Cir.1989); *In re Pizza of Hawaii, Inc.*, 761 F.2d 1374, 1379 (9th Cir.1985). Other circuits agree with the Ninth Circuit. *See In re Hart*, 923 F.2d 1410 (10th Cir.1991) (district court has discretion to hear issues presented for the first time on appeal); *In re Air Conditioning, Inc.*, 845 F.2d 293, 299 (11th Cir.) *cert. denied, First Interstate Credit Alliance*

*Inc. v. American Bank of Martin County*, 488 U.S. 993, 109 S.Ct. 557, 102 L.Ed.2d 584 (1988) (district court may hear matters not raised in bankruptcy court if record is thorough).

The Fourth Circuit has ruled that a party may not first complain on appeal that a bankruptcy plan was lengthened without good cause. *In re Arnold*, 869 F.2d 240, 244 (4th Cir.1989) (interpreting 11 U.S.C. § 1329). Extrapolating from this narrow holding by the Fourth Circuit, this Court will follow the Seventh Circuit's rule that matters never raised before the bankruptcy court will not be decided on appeal save in exceptional circumstances.

## II. Ex Parte Communication

The United States Trustee submitted a proposed confirmation order to the bankruptcy court on August 21, 1992. On August 25, 1992, the bankruptcy court entered the order. The Bank claims it never received a copy of the proposed order and was never given notice that the order was being considered. The Bank maintains that this exchange between the Trustee and the bankruptcy court was an impermissible ex parte communication, requiring revocation of the Order.

■ The Bank never moved for the bankruptcy judge's recusal under 28 U.S.C. § 455 and never made a Federal Rule of Civil Procedure 60(b) motion to vacate the Order of Confirmation in the court below. As a rule, this Court will not decide matters never raised before the bankruptcy court; such issues are considered waived on appeal. *Kroner,* 953 F.2d at 319. However, in exceptional circumstances, this Court may decide issues not raised on appeal, *Id.,* particularly where waiver of the issue could work an injustice. Exceptional circumstances are present in this case; a party has alleged prejudice due to ex parte communications between the lower court judge and an opposing party.

Over the last fifteen years, ex parte communications in the bankruptcy setting have drawn the concern of Congress. Attorneys complained that bankruptcy courts' close association with trustees created a club from which others were excluded.[4] Ex parte communications are now explicitly prohibited by the Federal Bankruptcy Rules. Fed.Bankr.R. 9003. In 1991, 9003(b) was added, prohibiting ex parte communications between the United States Trustees and the bankruptcy judge.

■ A written communication between the trustee and the bankruptcy judge is considered to be ex parte if an opposing party does not timely receive a copy of the submitted document. Virginia Code of Professional Responsibility DR 7-109(B)(2) (1986); *In re Colony Square Co.,* 60 B.R. 1003, 1021 (N.D.Ga.1986), *aff'd,* 819 F.2d 272 (11th Cir.), *rehearing denied en banc, Colony Square Co. v. Prudential Ins. Co.,* 833 F.2d 1021 (11th Cir.1987), *cert. denied,* 485 U.S. 977, 108 S.Ct. 1271, 99 L.Ed.2d 482 (1988).[5] The Trustee's submission of a proposed order to the bankruptcy judge in this case without sending copies to the creditor's counsel was inexcusable; the exchange was certainly an ex parte communication. The Trustee is instructed to avoid this practice in the future. *See, e.g., Colony Square,* 60 B.R. at 1021 (court disqualified law firm for not submitting copies of a proposed order to the opposing party).

■ The Bank asks this Court to revoke the August 25, 1992, Order of Confirmation because it was entered pursuant to impermissible exchanges between the judge and a party in interest. Revocation of an order is a drastic measure, and not always necessary; every instance of ex parte communication is not verboten. For example, "an exchange of pleasantries" is not the sort of ex parte communication with which ethics is concerned, *In re Casco Bay Lines, Inc.,* 17 B.R. 946, 956 (1st Cir. BAP 1982), and Rule 9003(b) permits communication between the bankruptcy judge and the United States Trustee over administrative matters.

■ A party seeking revocation of a bankruptcy order due to ex parte communications must either show that they were

---

**4.** There usually develops a close working relationship between the judge and "his" [or "her"] trustee, due to the necessity for frequent ex parte contacts between the judge and the trustee in the administration of the case.... [T]he combined force of all these factors seriously compromises the appearance of the bankruptcy judge as an impartial arbiter. They have worked to generate deep suspicion on the part of attorneys who practice in the bankruptcy court as to the fairness of the decisions of the bankruptcy court.

*In re Parr Meadows Racing Ass'n, Inc.,* 5 B.R. 564, 567 (Bankr.E.D.N.Y.1980) (quoting the Report of the House Comm. on the Judiciary, Bankruptcy Law Revision, H.R.Rep. No. 595, 95th Cong., 1st Sess., 89–90 (1977), 1978 U.S.C.C.A.N. (95 Stat.) 5787, 6051).

**5.** Rule 9003 does not displace state professional responsibility codes. Fed.Bankr.R. 9003 advisory committee's note.

prejudiced by the communications, *Colony Square,* 60 B.R. 1003, 1019, or that the bankruptcy judge "abdicate[d] his [or her] decision making process." *Id.* at 1020.

■ Although it was improper for the Trustee to submit its proposed order to the bankruptcy court without notifying the Bank, this Court believes that the circumstances do not require that the Order be vacated. When a judge has completed his or her decision-making process, there is a substantially reduced chance that the complaining party was prejudiced, and revocation of an order in that situation is unnecessary. *Id.* at 1023.

■ In this case, the debtors filed an amended Chapter 13 plan in May of 1992. On July 28, the bankruptcy court held a confirmation hearing and closely questioned the Debtors on the feasibility of the plan. At that time, the parties informed the judge of the monthly payment amount, the interest rate, the five-year time span of the plan, the balloon payment, and the debtors' financial situation.

The judge issued a Memorandum Opinion on July 30, 1992, setting forth the bankruptcy court's basis for confirming the Chapter 13 plan and ordering the Trustee to draw up a proposed confirmation order in accordance with the Memorandum Opinion. The Trustee did so and submitted the order three weeks later; that order essentially traced the Memorandum Opinion and did not go beyond what the judge had already decided nearly a month before.[6] The judge entered the Order on August 25, 1992.

The Bank has failed to explain how it could be prejudiced under these circumstances, and does not demonstrate how any specific part of the Order goes beyond what the judge had previously decided. At no point did the bankruptcy court abdicate its judicial powers to the Trustee; the judge had made his decision two days after the hearing, weeks before the Trustee submitted an order. The Trustee submitted the order at the judge's request, and did not attempt to expand the bounds of the July 30, 1992, Memorandum Opinion. Consequently, this Court refuses to vacate the Order of Confirmation on the grounds of an ex parte communication between the Trustee and the bankruptcy judge.

### III. Modification of the Bank's Rights as a Secured Creditor

#### A. *Lowering a Secured Claim's Annual Interest Rate*

The Bank argues that its allowed secured claim may not be modified in the bankruptcy plan by lowering the annual interest rate from 11.82% to 10%, even though the Debtors are increasing their monthly payments from $520.84 to $531.57. The Bank emphasizes that the Debtors never objected to the filing of the claim for $44,593.81 at 11.82% annual interest and never sought a valuation hearing to determine allowance of the claim under 11 U.S.C. § 506. Under such circumstances, the Bank contends, a secured, allowed claim may not be altered.

■ The Bank never specifically raised the issue of modification of the interest rate before the bankruptcy judge.[7] Be-

---

**6.** The bankruptcy court's Memorandum Opinion, issued July 30, 1992, states:

The Debtor's Third Modified Plan provides for the payment of the Bank's claim at an interest rate of 10 percent over a sixty-month period with payments of $531.57 and one balloon payment for the remaining principal balance

| Creditor... | Payment | # of Mos. | Interest Rate | Value | Disbursing Agent |
|---|---|---|---|---|---|
| Grundy.... | $531.57 | 144 | 10.00% | $44,593.81 | Trustee |

Below this line in the chart, there is the following sentence: "at the end of 60 months debtor's [sic] will refinance this debt and pay balloon to GNB." This Court assumes that "144 months" refers to the calculations used to find the correct present value combination of principal and

at the end of the five-year period. The payment also provides for an extension of the Plan from three years to five years.

The Order of Confirmation, entered August 25, 1992, three weeks later, states:

To Creditors on allowed claims as provided for in the Plan as follows:

interest that equals $44,593.81, if no balloon payment would be made.

**7.** On June 10, 1992, the Bank filed the following Objection to Confirmation of the Debtors' amended plan: "The third modified plan vio-

cause the Bank failed to object to the lowering of the interest rate before the bankruptcy court, it has waived its right to raise the issue on appeal. *Kroner*, 953 F.2d at 319; *see also In re Arnold*, 869 F.2d 240, 244.

### B. *Curing or Waiving of the Arrearage*

■ The bankruptcy court refused to require payment of the Debtors' arrearage in the monthly payments of the Chapter 13 plan; instead, the court confirmed a plan that permitted payment of the arrearage as part of a lump sum at the plan's end. The Bank asserted that the arrearage should have been cured during the plan, but did not elaborate on this argument in its appellate briefs. In its formal objections to the bankruptcy court, however, the Bank argued that 11 U.S.C. §§ 1322(b)(2) and 1322(b)(5) require curing of the arrearage in the plan.

11 U.S.C. § 1322(b)(2) states, "the plan may ... modify the rights of holders of secured claims, *other than a claim secured only by a security interest in real property that is the debtor's principal residence*, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims." (Emphasis added.)

Essentially, the Bank asserts that because its claim is secured by the Debtors' mobile home and land, the claim is secured by the principal residence of the Debtors, and thus the Bank's claim cannot be modified. The bankruptcy court disposed of this issue by deciding that this case does not come within the purview of § 1322(b)(2)'s prohibition against claim modification. The bankruptcy court interpreted "a security interest in real property that is the debtor's principal residence," § 1322(b)(2),[8] to mean "a classic home mortgage real estate first deed of trust," citing its own previous holding in *In re Lindamood*, 34 B.R. 330 (Bankr.W.D.Va. 1983) and *Grubbs v. Houston First Am. Sav. Ass'n*, 730 F.2d 236 (5th Cir.1984) (en banc).[9]

The provision of § 1322 that provides for the curing or waiving of arrearage is (b)(3), and not (b)(2). § 1322(b)(3) states: "the plan may ... provide for the curing or waiving of any default." § 1322(b)(2) deals with the modification of claims; "modification" must be distinguished from "curing or waiving." *Grubbs*, 730 F.2d 236, 244.

In addition, § 1322(b)(3) stands in sharp contrast from § 1322(b)(2) in the lack of restrictions it places on debtors who seek to cure or waive an arrearage. While § 1322(b)(2) bans modification of claims secured by the debtors' real property that is also his or her principal residence, § 1322(b)(3) permits the curing or waiving of *"any* default." (Emphasis added.) § 1322(b)(3) permits the curing or waiving of any arrearage without regard to the security involved. *In re Epps*, 110 B.R. 691, 706 (E.D.Pa.1990); 5 Collier on Bankruptcy ¶ 1322.07[2] (15th ed. 1993). Thus, the restrictions of § 1322(b)(2) do not apply to this case, regardless of how the Debtors' security is defined.

■ The bankruptcy acts are to be construed liberally in favor of the debtor, *Gleason v. Thaw*, 236 U.S. 558, 560, 35 S.Ct. 287, 288, 59 L.Ed. 717 (1915), in order

---

lates Bankruptcy Code § 1325(a)(5) because Grundy National Bank has rejected the plan ... and the value, as of the effective date of the plan, or property to be distributed under the plan on account of such claim(s) is less than the allowed amount of such claim(s)." No mention is made whatsoever of the Bank's specific complaint that the lowering of the interest rate reduces the Bank's allowed secured claim.

**8.** The bankruptcy court actually cited to 11 U.S.C. § 1322(a)(2), but this was surely a typographical error, as § 1322(a)(2) makes no reference to the modification of claims.

**9.** This Court likewise has held that § 1322(b)(2) does not apply to short-term consumer loans, regardless of the security involved. *Capitol Credit Plan of Tennessee, Inc. v. Shaffer*, 116 B.R. 60, 61–62 (W.D.Va.1988). However, it is 11 U.S.C. § 1322(b)(3), and not § 1322(b)(2), that governs the curing or waiving of an arrearage. Today's ruling on the bankruptcy court's waiving of the Debtors' arrearage would remain unaffected by an analysis of § 1322(b)(2).

to allow debtors to get on with their lives. *Landmark Fin. Serv. v. Hall*, 918 F.2d 1150 (4th Cir.1990). 11 U.S.C. § 1322(b)(3) provides that a Chapter 13 bankruptcy plan "may" provide for the curing or waiving of any default. In this case, the Bank will obtain the amount of its arrearage in full in the balloon payment at the end of the plan, rather than receiving the arrearage as part of the monthly payments. This was well within the requirements of § 1322(b)(3). Under these circumstances, the bankruptcy court exercised sound discretion in affirming the plan, and the lower court's refusal to cure arrearage in the monthly payments was not clearly erroneous.

## IV. 11 U.S.C. § 1322(c) Limits On Chapter 13 Plans

The Bank alleges two violations of 11 U.S.C. § 1322(c): first, that the bankruptcy court failed to make a finding of good cause for extension of the bankruptcy plan beyond three years; and second, that the plan extends beyond 11 U.S.C. § 1322(c)'s five year limitation for Chapter 13 bankruptcy plans.

### A. *Cause for Extension of Chapter 13 Plans Beyond Three Years*

§ 1322(c) states: "The plan may not provide for payments over a period that is longer than three years, unless the court, for cause, approves a longer period, but the court may not approve a period that is longer than five years." The bankruptcy court confirmed a plan for the Debtors that will extend beyond three years. The Bank now complains that the lower court never found cause to lengthen the plan as required by § 1322(c).

■■ The Bank again asks this Court to address an issue never raised before the bankruptcy court. The Bank never objected to the Debtors' extension of the plan to five years despite plentiful opportunities at the confirmation hearing. When a party fails to preserve its objection to the extension of a Chapter 13 plan beyond three years, this Court will not review the matter on appeal. *In re Arnold*, 869 F.2d at 244 (interpreting the good cause requirement of 11 U.S.C. § 1329).[10]

### B. *Five Year Limitation on all Chapter 13 Plans*

■■ The Bank next claims that the Debtors' Chapter 13 plan violates the five year time limitation in 11 U.S.C. § 1322(c). The Bank did formally note its objection on this point. The sixty monthly plan payments were to start March 1, 1992, with the sixty first and last payment, the balloon payment, due on March 1, 1997. The bankruptcy court ordered the Debtors to begin payments in April, 1992.

The Debtors claim that the last plan payment is exactly sixty months (or five years) from the first payment, rather than a day after the five years are over. The Bank argues that the opposite is true, and that the balloon payment is scheduled *after* the end of five years.

The Bankruptcy Code does not provide definite starting and ending dates for bankruptcy plans in order to measure compliance with 11 U.S.C. § 1322(c). Some courts have started the five year clock with the first payment order issued by the bankruptcy court. *See In re Woodall*, 81 B.R. 17 (Bankr.E.D.Ark.1987); *see also* 11 U.S.C. § 1326(a)(1) (unless a court orders otherwise, a debtor must start making payments within thirty days of filing the proposed bankruptcy plan).

Perhaps the most logical date for the five years to start running is the confirmation date. *See* 5 Collier on Bankruptcy, ¶ 1322.15 (15th ed. 1993); *Cf. West v. Costen*, 826 F.2d 1376 (4th Cir.1987) (starting the running of the five year period for

---

**10.** It is important to keep in mind that Congress added a five-year time limitation on Chapter 13 plans to the Bankruptcy Code for the sake of *debtors*, to protect debtors against "involuntary servitude." 5 Collier on Bankruptcy ¶ 1322.15 (quoting H.R.Rep. No. 595, 95th Cong., 1st Sess. 117 (1977)). Because of the rationale behind § 1322(c), some courts will not permit creditor objections to the lengthening of the plan. *See, e.g., In re Porter*, 102 B.R. 773, 777–78 (9th Cir. BAP 1989).

post-confirmation modifications in 11 U.S.C. § 1329 at the date of confirmation).

Using the confirmation date as the starting point in this case, the Debtors' plan began on August 25, 1992. The Debtors had already commenced payments on the plan pursuant to court order in April 1992, and should be able to complete their plan as scheduled several months before August, 1997, well within the five-year limit.

## V. Feasibility

The Bank next argues that the Chapter 13 plan should never have been confirmed because it lacked feasibility. Before a Chapter 13 plan may be confirmed, the bankruptcy court must determine that the debtor is able to make the payments required in the plan. 11 U.S.C. § 1325(a)(6). Because a debtor files for bankruptcy in the first instance after experiencing financial difficulties, it would be a waste of the bankruptcy system's resources to affirm plans that debtors are unable to follow.

■ Various courts have been reluctant to confirm bankruptcy plans that required the payment of a large lump sum at the end with no source of income for the payment in sight. *See, e.g., In re Hogue*, 78 B.R. 867, 872 (Bankr.S.D.Ohio 1987); *In re Schenk*, 67 B.R. 137, 140 (Bankr.D.Mont. 1986). One court has suggested that the following factors should be examined to determine whether a plan with a balloon payment at the end should be confirmed:

a) the equity in the property at the time of the filing;

b) the future earning capacity of the debtor;

c) the future disposable income of the debtor;

d) whether the plan provides for the payment of interest to the secured creditor over the life of the plan;

e) whether the plan provides for payment of recurring charges against the property, including insurance, local property taxes and utility charges;

f) whether the plan provides for substantial payment to the secured creditor which will significantly reduce the debt

and enhance the prospects for refinancing at the end of the plan.

*In re Brunson*, 87 B.R. 304, 312 (Bankr. D.N.J.1988). The Debtors have the burden of proving that the plan is feasible, *In re Hogue*, 78 B.R. at 871; the burden of persuasion then shifts to any objecting creditors.

■ The bankruptcy court in this case relied primarily on the Bank's assessment of the Debtors' capacity to pay the loan when they signed the note. The lower court acknowledged that the Debtors' present income could not pay off the balloon payment of over $30,000 at the end of five years, but stated that the Debtors would be able to obtain refinancing. However, the record shows that the Debtors had no equity in their property at the time they filed for bankruptcy, and counsel for the Endicotts openly admitted at the confirmation hearing that the Debtors would be forced to seek refinancing at the end of the plan due to a lack of personal financial resources. At the July 28, 1992, hearing, the only witness who testified was Jackie Endicott, one of the Debtors, who was not able to describe his prospects for refinancing. There simply is no evidence on the record either way on the likelihood of refinancing, and as the record stands now, any assumptions on that point are simply speculation.

In view of the bankruptcy court's determination that the Debtors could obtain refinancing in spite of the lack of evidence either way, this Court remands this case to the bankruptcy court for further findings of fact on the issue of refinancing.

## VI. Good Faith

The Bank also argues that the Debtors did not offer the bankruptcy plan in good faith. The Bank did raise this issue in its objections to the proposed bankruptcy plan; although the bankruptcy court did not explain its reasoning, the court implicitly found good faith through confirmation of the plan.

Because this case is being remanded on the issue of the plan's feasibility, this Court instructs the bankruptcy court to

reconsider the factors determining good or bad faith after ascertaining the Debtors' chances of obtaining refinancing at the end of the plan. *See Deans v. O'Donnell*, 692 F.2d 968, 972 (4th Cir.1982).

### Conclusion

This case is remanded to the bankruptcy court for findings on the likelihood that the Debtors will be able to obtain refinancing in five years. The Debtors have the burden of proving that their chances for refinancing are more than speculative. Upon remand, the bankruptcy court is asked to reconsider the issue of the Debtors' good or bad faith in proposing their plan in light of the evidence concerning refinancing.

### OPINION ON REHEARING

#### July 23, 1993.

This matter is before this Court on a Motion for Rehearing brought by Grundy National Bank, a creditor to the Endicotts' bankruptcy estate, as well as a Motion for Rehearing brought by the United States Trustee, Jo S. Wick, concerning the Memorandum Opinion entered by this Court in this case on April 20, 1993.

This Court's first Opinion in this matter dealt with the appeal of Grundy National Bank ("the Bank"). In the appeal, the Bank, dissatisifed with the bankruptcy court's Confirmation Order entered on August 25, 1992, set forth a variety of grounds for reversal on appeal. Several of these grounds had not been raised before the bankruptcy court. One of the issues not raised below was the claim that ex parte communications between the United States Trustee and the bankruptcy court impermissibly tainted the proceedings, necessitating revocation of the Confirmation Order.

Although this Court refused to hear other issues on appeal that were not raised before the lower court, the ex parte issue was addressed due to the exigent circumstances. In doing so, however, this Court did not seek the arguments of one of the parties allegedly involved in the ex parte communication: those of the United States Bankruptcy Trustee, Jo S. Wick ("Trustee").

The Trustee had not issued a brief in the case because she did not perceive a need to contest or defend the Confirmation Order. The debtors were adequately represented by Thomas Antenucci. However, Mr. Antenucci did not fully address the issue of ex parte communications in his appellate brief.

Counsel for the Bank, Michael L. Shortridge ("Shortridge"), argued that the Trustee refused, despite repeated requests, to send him a copy of the proposed confirmation order which the Trustee submitted to the bankruptcy court. In a memorandum opinion issued two days after the confirmation hearing, United States Bankruptcy Judge H. Clyde Pearson ordered the Trustee to submit a proposed order. Three weeks later, the Trustee complied, and the order was formally entered by the bankruptcy court a few days later. Shortridge claimed that he did not receive a copy of the proposed order until it was formally entered by the bankruptcy judge.

This Court initially agreed with Shortridge that the Trustee's submission of a proposed confirmation order to the bankruptcy court without sending copies to opposing counsel constituted impermissible ex parte communications, following *In re Colony Square Co.*, 60 B.R. 1003 (N.D.Ga. 1986) (involving the submission of a proposed confirmation order without furnishing copies to the opposing party). However, this Court refused to vacate the Confirmation Order, finding that Judge Pearson never abdicated his judicial decision-making, having entered a Memorandum Opinion weeks before the proposed order was submitted. The proposed order did not include anything outside of the parameters of the Memorandum Opinion, and thus, the Bank could not demonstrate any harm or prejudice to its position.

However, Shortridge failed to point out to this Court that the Trustee had not *unilaterally* decided to stop sending copies to opposing counsel. Nowhere in his briefs did Shortridge even imply that this was more than a one-time occurrence. The only hint that there was more to the situation than Shortridge described was one sentence in a letter written by Shortridge to

the Trustee which Shortridge included as an exhibit to this Court, but which he did not comment upon, clarify, or draw to the Court's attention in any way. In that letter, dated August 4, 1992, Shortridge stated, "As always, I understand that it is *your* policy not to send copies of proposed confirmation orders to objecting creditors." (Emphasis added.)

At the hearings on the motions for rehearing held on May 24 and May 28 in this matter, this Court discovered for the first time that the Trustee had not unilaterally stopped sending copies of proposed confirmation order to opposing parties. Instead, the Court found that the Trustee was following a custom of many years, handed down from trustee to trustee.

More egregious still, Shortridge failed to make known to this Court, at any juncture in these proceedings, that the Trustee had the *express* permission of the bankruptcy court to carry out this practice. Indeed, Shortridge confronted the Trustee on this very issue more than a year ago in other bankruptcy cases. At that time, the Trustee, concerned that the issue posed a potential problem, wrote to Judge Pearson in a letter dated April 22, 1991. In that letter, a copy of which was sent to Shortridge, the Trustee stated:

> "This letter is to request clarification of procedures involving trustee's confirmation orders.... I do not send confirmation orders to creditors and their attorneys for their endorsement prior to the court's entry of these orders.
>
> While it is true that in other courts and in other circumstances an attorney who drafts an order must circulate it to all other attorneys of record prior to entry with the court, *I as trustee, have never so circulated the orders nor did Jim Nunley before me.*"

(Emphasis Added.)

In response, Judge Pearson wrote back to the Trustee in a letter dated April 24, 1991, stating:

> I have your letter ... concerning you as Chapter 13 trustee submitting confirma-

tion orders to the Court without endorsement of other counsel.

> Where the Court hears confirmation of a plan and directs the trustee to submit an order in open court confirming the plan, there is no need for this confirmation order to be endorsed by counsel for any parties unless the Court so directs. It would be an insurmountable task for a Chapter 13 trustee to obtain the endorsement of counsel of various creditors in submitting a confirmation order and I do not require it unless directed by the Court from the bench.
>
> I trust this will resolve the issue presented.

Copies of this letter were sent by Judge Pearson to Shortridge and to Thomas W. Kennedy, the Assistant United States Trustee.

Shortridge never brought these letters to this Court's attention, despite their clear applicability to this case. Nor did Shortridge reveal to the Court that he knew, and that it was in fact common knowledge, that it was the policy of the bankruptcy court for the Trustee not to send copies of the order to any creditors, including objecting creditors, where the opinion of the bankruptcy court, as stated in open court or by written opinion, directed the Trustee to prepare and submit the order.

In evidence taken by this Court in its rehearing of May 28, 1993, Shortridge admitted knowledge of this policy (Tr. p. 103–105). However, contrary to this knowledge that he has subsequently admitted having, the factual scenario originally presented by Shortridge was that the Trustee's act of not sending copies of the confirmation order was simply an unsanctioned policy of this particular Trustee. Furthermore, Shortridge failed to advise the Court that the Clerk of the Court sends a copy of the confirmation order upon entry to every creditor, in accordance with bankruptcy court policy. Nor did Shortridge advise the Court that the Trustee routinely corrected any errors in the confirmation orders and that neither he nor any other attorney or litigant had ever been prejudiced by having

the Trustee preparing the order and the Clerk sending copies to the parties.

At the re-hearing in this case, this Court heard additional facts relating to the issue of ex parte orders which may not have been known to Shortridge and for which the Court does not hold him accountable. Undisputed testimony reveals that it is not only the policy of one judge and one trustee in the Bankruptcy Court for the Western District of Virginia, but that the procedure is the same throughout the Western District of Virginia. Undisputed testimony also reveals that the same procedure is carried out in the Eastern District of Virginia in an even more informal way, that is, the trustee prepares the confirmation order and submits it to the judge without copies to counsel or other parties.

This Court also finds that Shortridge was amiss in not informing the Court of the administrative nature of a confirmation order. From the evidentiary hearing, this Court learned that the Trustee merely fills in blanks in a form order. The information that the Trustee fills in the blanks is explicitly furnished by the opinion of the bankruptcy court either as given from the bench or, as in this case, by written opinion. This evidence characterizes the nature of the Trustee's function as purely administrative and not a communication with the bankruptcy court concerning the court's action in a particular case.

This Court also has before it a copy of proceedings in the Bankruptcy Court held at Abingdon, Virginia on May 18, 1993 (Wick Exh. 1 and 2)[1] shortly after this Court's last opinion and order in this case. It is obvious from this transcript and other testimony that this Court's opinion has created problems affecting the ability of the bankruptcy court to function in an expeditious manner considering the workload of the bankruptcy court and trustees. I note that Judge Pearson has interpreted this Court's opinion as requiring the endorse-

ment of the order by all creditors, or that the order be signed in open court when the case is called. Obviously, this requirement will result in interminable and unnecessary delays. While this Court did not rule that actual endorsement was required, it is apparent that the Bankruptcy Judge could not know the order was circulated unless it was so endorsed.

With this new evidence in hand, the Court will now proceed to alter and clarify its original opinion:

## ANALYSIS

Although Bankruptcy Rule 9003(a) prohibits ex parte communications between a bankruptcy judge and a party in interest, Rule 9003(b) (emphasis added) states:

> *Except as otherwise permitted by applicable law*, the United States trustee and assistants to and employees or agents of the United States trustee shall refrain from ex parte meetings and communications with the court concerning matters affecting a particular case or proceeding. *This rule does not preclude communications with the court to discuss general problems of administration and improvement of bankruptcy administration, including the operation of the United States trustee system.*

The Editor's comment states that the Rule "is intended to underline and enforce the separation of judicial and administrative functions."

The Court is of the opinion that there is no distinction in this rule regarding sending out copies of an order to opposing parties and obtaining endorsement by opposing parties. In the ordinary situation, a trustee who composes an order for the court without sending copies to opposing parties is participating in ex parte communication. Likewise, if a party in interest other than the trustee composes an order at any juncture of the case (including the final point of confirmation) and submits the

---

**1.** Judge Pearson remarked as follows:

A recent decision of the District Court indicates that it is inappropriate and improper for an attorney to tender to this court an order for entry unless it is endorsed or certified to

be endorsed by all parties of interest if it is an agreed order.

And that would include ... every party who may have an interest in it.

order to the bankruptcy court without sending copies to opposing parties, that party in interest would be participating in ex parte communication.

■ However, two factors cause the instant case to fall within a narrow exception which points up the purpose of the rule to distinguish between judicial and administrative acts. First, the nature of the confirmation order is administrative in form. Second, the judge has already made his decision either orally or in writing, in the presence of all objecting parties; therefore, no judicial act is involved in the actions of the Trustee. These two factors put the matter within the scope of Rule 9003(b)'s administrative exception.

Practical considerations have compelled bankruptcy courts throughout the country to adopt the practice of ordering trustees to submit proposed confirmation order without requiring them to furnish copies to opposing parties. Opposing parties are not prejudiced thereby. The clerk of court routinely sends a copy of the confirmation order upon entry to every creditor. Furthermore, if the order that is eventually entered in any way differs from the judge's decision, the opposing party need only bring it to the trustee's or judge's attention, and the trustee or judge will change the order to conform with the opinion. If the order does not conform to the opinion, the party would also have grounds for appeal, as it would in any case, if the bankruptcy court refused to alter the order. If the trustee in any way attempted to persuade the bankruptcy court to re-open any issues without notice to opposing parties, or if the trustee surreptitiously changed the judge's original holding, an objecting party would have clear grounds for requesting that the order be revoked, *first* at

the bankruptcy court level, and *then* on appeal.[2]

The confirmation order, however, leaves little room for the trustee to maneuver. It is a printed form which contains spaces to plug in numbers—the number of months over which the plan will extend and the amount the debtors will pay to creditors on a monthly basis. At a glance, an opposing party can see whether or not the trustee has made a mistake. The Trustee in this case has indicated that she is always willing to accommodate the corrections of mistakes, as she also stated in her April 22, 1991, letter to Judge Pearson.

If it were a matter of sending out a few copies of the confirmation order, the Trustee would certainly send out copies to opposing parties in this situation. But sending out a confirmation order to all of the opposing parties is never a small matter. Instead, tens, even hundreds, of creditors may be waiting in the wings—not directly contesting the confirmation order, but requiring final notice of the bankruptcy judge's decision just the same. Because of the undue burden this would place on the trustee, notification is left to the bankruptcy clerk who is responsible for sending out copies to all the parties once the order is entered. This is the customary practice in the Western District of Virginia, as described by Judge Pearson and the Trustee in their letters; as set forth by Glen W. Strickler, Chapter 13 United States Bankruptcy Trustee in oral testimony; and as outlined by Gerald M. O'Donnell, Chapter 13 United States Bankruptcy Trustee for the Eastern District of Virginia.

■ As a result of this Court's previous opinion, Shortridge has filed charges against the Trustee with the Virginia State

---

**2.** Shortridge also argues that the reason that he wants a copy from the trustee, rather than from the clerk, is the fear that he will not receive his copy within the ten days so he can file a timely appeal. He points out that the Bankruptcy Rules do not allow the three day mailing time allowed in the Federal Rules of Civil Procedure. He claims that it sometimes takes four or five days for mail to arrive from Roanoke, Virginia to his office in Norton, Virginia. However, Shortridge cites no incident involving himself or any other attorney that has ever been prejudiced as a result of the ten day rule. Obviously, a copy mailed by the Trustee could just as easily be delayed by the mail as one by the clerk. Moreover, while the Bankruptcy Rules do not allow for relief under *Fed.R.Civ.P.* 60(b), Bankruptcy Rule 9024 allows a party 180 days to file a complaint to revoke an order confirming a chapter 11 or 13 plan. Also, Bankruptcy Rule 8002(c) allows for an extension of the ten day rule for a period not to exceed 20 days.

Bar. Although those charges are beyond this Court's jurisdiction, the Court will take the liberty to speak to the issue, as the conduct of attorneys, as officers of the court, is within the Court's purview. In this Court's opinion, the Trustee's actions in this case were ethical and beyond reproach. Although the Virginia Code of Professional Responsibility DR 7–109(B)(2) prohibits communications in writing between an attorney and a judge unless the attorney furnishes copies to opposing counsel, DR 7–109(B)(4) permits an exception if such conduct is "otherwise authorized by law."

Judge Pearson's April, 24, 1991, letter to the Trustee constitutes authorization by law within the meaning of DR 7–109(B)(4). The opposing parties in the particular case were notified, and Judge Pearson was sanctioning a practice that was a custom in the Western District of Virginia's Big Stone Gap and Abingdon divisions. The Trustee had not unilaterally adopted her own policy; she sought and received the permission of the bankruptcy court to continue the practice. In this Court's view, the Trustee handled the matter as well as any attorney could possibly be expected to, and she should not be held to a higher standard which would require her to go above and beyond the authorization of the bankruptcy court in which she practiced.

Shortridge argues that Judge Pearson never supported the elimination of the requirement to send out copies to opposing parties; rather, Shortridge narrowly construes Judge Pearson's letter to mean that the trustee still had to send out copies to all creditors, but did not have to obtain their endorsement before sending the confirmation order to the Judge. Although this is a possible interpretation, it is not the probable or logical interpretation of Judge .Pearson's intent. Judge Pearson knew from the Trustee's letter that Shortridge objected to not receiving a copy; thus, if Judge Pearson disagreed with the Trustee's actions, he would have so stated.

As to every other issue in this Court's Memorandum Opinion issued April 20, 1993, the Court stands by its previous decision.