**In re Rudolph ST. CLOUD and Marthe J. Jeudi, Debtors.**

**Bankruptcy No. 96–12404–JNF.**

United States Bankruptcy Court, D. Massachusetts, Eastern Division.

June 27, 1997.

Joseph G. Albiani, Winchester, MA, for debtors.

Daniel Gray, Newton, MA, for FNMA.

## MEMORANDUM

JOAN N. FEENEY, Bankruptcy Judge.

## I. PROCEDURAL BACKGROUND

Rudolph St. Cloud ("Mr. St. Cloud") and Marthe J. Jeudi ("Ms. Jeudi") (collectively, the "Debtors") filed a Chapter 13 petition on April 2, 1996. On Schedule A–Real Property, the Debtors stated that they are the owners in fee simple of a two family house located at 144 Fuller Street, Dorchester, Massachusetts (the "Property"). They valued the Property at $57,000.00. On Schedule D–Secured Claims, the Debtors indicated that the Property was subject to a first mortgage held by "Comfed Saving [sic] Bank c/o FNMA" ("FNMA")[1] with an outstanding

---

1. FNMA, an abbreviation for Federal National Mortgage Association, is the current holder of the note and mortgage on the Property.

balance of $180,000.00. On Schedule I–Current Income, the Debtors reported that they are both employed by Morrison Crothhall, a nursing home, and earn net wages of $1,870.00 per month. The Debtors also reported receiving $600.00 per month in rental income, for a total monthly combined income of $2,407.06. On Schedule J–Current Expenditures, the Debtors reported $925.00 in expenditures and net disposable income of $1,546.00 before payment of any plan or mortgage debt service. Although the Debtors' Schedules reflect no debt other than the FNMA mortgage, the City of Boston filed a secured proof of claim for real estate taxes in the sum of $150.25 and the Commonwealth of Massachusetts filed a proof of claim for state income taxes in the sum of $2,000.00.

On April 4, 1996, the Debtors filed a Chapter 13 plan, through which they proposed to pay FNMA's secured claim "$57,000 paid @ 9 % over 60 months @ $1,183.23 per month for a total of $70,993.80" and to pay its unsecured deficiency claim "10 % or $12,300 over 60 months." On June 11, 1996, the Debtors filed 1) a "Motion under 11 U.S.C. § 1322b(2)[sic] to Modify the Rights of a Holder of a Secured Claim" (the "Motion to Modify"), through which they sought to bifurcate FNMA's claim, and 2) a Motion for Determination of Secured Status (the "Motion to Determine Claims"), filed pursuant to 11 U.S.C. § 506(a) and (d), through which they sought to establish FNMA's allowed secured claim in the sum of $57,000.00 and its unsecured claim in the sum of $137,836.00. FNMA filed an Objection to the Motion to Determine Claims, through which it disputed the Debtors' valuation of the Property. FNMA averred that the Property has a value of $85,000.00. Both parties obtained appraisals in support of their asserted valuations.

FNMA filed a Proof of Claim on May 31, 1996, in which it stated that the total amount owed on account of its secured claim was $187,835.77, that interest and fees continue to accrue, and that $25,517.29 was the amount of the mortgage arrearage, consisting of 11 payments, legal fees and costs. At a hearing on the Motion to Modify and the Motion to Determine Claims held on July 29, 1996, the Court granted the Motion to Modify and, in light of the factual dispute presented with respect to valuation, scheduled the Motion to Determine Claims for an evidentiary hearing. At the evidentiary hearing, the parties reported that they agreed that the value of the Property is $82,000.00. The Court ordered the Debtors to file an Amended Plan by November 4, 1996.

On November 12, 1996, the Debtors filed a First Amended Plan (the "Amended Plan"), which provided for payment of FNMA's secured claim in the sum of "$82,000 paid @ 9% over 60 months @ $1,195 per month for a total of $70,505 [sic] On the 60th month, a balloon payment of $31,626.40 will be made directly from Debtors to creditor for a final payoff of $102,131.40." Through the Amended Plan, the Debtors provide for payment of FNMA's unsecured claim in the sum of "$105,835.77 @ 10% or $10,584 for a monthly payment of $176.39." FNMA filed an Objection the Amended Plan, asserting two grounds: 1) that the Amended Plan does not comply with § 1325(a)(6), because the balloon payment feature, pursuant to which the Debtors intend to pay $31,626.40 at the conclusion of the plan term, is not feasible; and 2) that the Amended Plan does not comply with § 1325(a)(5)(B)(ii) because the proposed 9% interest rate does not provide FNMA with the present value of its secured claim as of the effective date of the plan.[2]

The Court conducted an evidentiary hearing on FNMA's Objection to the Amended Plan on April 4 and April 11, 1997. At the

---

**2.** Section 1325 provides in relevant part the following:

(a) Except as provided in subsection (b), the court shall confirm a plan if—
(5) with respect to each allowed secured claim provided for by the plan—
(A) the holder of such claim has accepted the plan;
(B)(i) the plan provides that the holder of such claim retain the lien securing such claim; and

(ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim; or
(C) the debtor surrenders the property securing such claim to such holder; and
(6) the debtor will be able to make all payments under the plan and to comply with the plan.
11 U.S.C. § 1325(a)(5), (6).

trial, the parties stipulated that the correct amount of the balloon payment under the Amended Plan was $39,448.96.[3] The Court heard testimony from the Debtors and two experts, and admitted numerous exhibits into evidence. At the conclusion of the trial, the Court took under advisement the issues raised by the Amended Plan and FNMA's Objection.[4]

## II. FACTS

Mr. St. Cloud has been employed as a driver at a hospital known as the Hebrew Center[5] in Boston for the past twelve years. Ms. Jeudi has been employed by the Hebrew Center as a housekeeper for ten years. The Debtors testified that they earn an hourly wage as reflected in Schedule I and that they receive regular annual raises of approximately 15 percent.

The Debtors purchased the Property in 1989 for $185,000.00, which they financed with a note and mortgage from Cornfed Savings Bank. The Debtors executed the original note and mortgage on March 7, 1989 in the principal amount of $171,000.00. The mortgage was for a term of 30 years with a fixed annual interest rate of 10.875 percent.[6] Although the note provided for the payment of $1,612.00 per month, according to the Debtors, the monthly payment was $1,926.00, which included an escrow for real estate taxes. At the time of the commencement of their Chapter 13 case, the Debtors were approximately $25,000.00 in arrears in their mortgage payment. The Debtors fell into arrears because the monthly payments were "too high" in light of the amount of their incomes.

According to Mr. St. Cloud, the Property is in fair condition as some repairs need to be made to the roof and windows and the house needs to be painted. FNMA's appraiser, Leonard Bacevicius, agreed that the Property is in average condition. He testified that the Property is appreciating in value and will continue to appreciate in value over the next several years, assuming economic conditions do not deteriorate.

Since commencing their Chapter 13 case, the Debtors have paid over $15,000.00 to the Chapter 13 trustee in connection with the Amended Plan. Mr. St. Cloud testified that he recently raised the rent for his tenant's unit from $600.00 to $700.00 per month and that his tenant, whose payments are current, agreed to the increase.

FNMA, through the testimony of Charles Ferraro,[7] an expert in residential mortgage lending, presented evidence showing 1) that there is no generally accepted market for loans to borrowers on terms such as the forced credit set forth in the Debtors' proposed Amended Plan because no lender extends credit based upon a 100 percent loan to value ratio; 2) that the usual loan to value ratio for a residential mortgage is 70 to 80 percent; 3) that a lender would classify the Debtors as Class D borrowers because of their pre-bankruptcy history of delinquencies; 4) that a lender would add two percentage points to any interest rate in consideration of the Debtors' poor credit and the balloon payment; 5) that, assuming the unlikely event that a lender would refinance the Debtors' obligation, the probable interest rate that would be available at the present

---

**3.** At the commencement of the hearing, the Court indicated that its calculation of the amount of the balloon payment differed from the Debtors' calculation under the Amended Plan. The Court made its calculations and methodology available to counsel to the Debtors and FNMA. Thereafter, both parties agreed that they would be bound by the Court's calculation of the amount of the balloon payment.

**4.** Although the Court indicated at the conclusion of the trial that it would first determine the interest rate and then schedule a hearing for dictation of findings of fact and rulings of law on the balloon payment issue, upon further consideration, the Court believes that a written decision on both issues will better serve the parties and other litigants.

**5.** Although the debtors are employed at the Hebrew Center, they are paid by an entity known as Morrison Crothall.

**6.** Although neither the Debtors nor FNMA introduced a copy of the note and mortgage at trial, the parties stipulated to the introduction of the note and mortgage as an exhibit after the trial.

**7.** The parties stipulated that the expert testimony they presented in the case of *Euclides Baptista*, Chapter 13 case no. 95–18223–JNF, which was tried on the same day as this contested matter, would apply in this case.

time would be between 15 and 16 percent; and 6) that, assuming that the Debtors had made their plan payments for two years and were no longer in bankruptcy, they could obtain refinancing with an interest rate of between 8 and 9 percent.

The Debtors, through the testimony of their lending expert, David Eckel, presented evidence indicating 1) that there are lenders in the current marketplace who would extend credit to the Debtors based upon a 100 per cent loan to value ratio, notwithstanding their status as Chapter 13 Debtors; 2) that a likely interest rate for the forced credit provided in the Debtors' Amended Plan would be 14 percent;[8] and 3) that assuming the Debtors complied with their Chapter 13 plan for two years, it is likely that they would qualify for refinancing in the sum of the proposed balloon payment with a secondary market lender at an adjustable interest rate of approximately 9.5 percent.

The Court takes judicial notice that the average interest rate for a thirty year fixed mortgage is currently 7.82 percent. *Massachusetts Division of Banks,* Mortgage Rate Update (June 15, 1997).

## III. DISCUSSION

### A. Interest Rate Pursuant to 11 U.S.C. § 1325(a)(5)(B)

■ The first issue presented is what is the appropriate rate of interest that the Debtors must pay FNMA on its secured claim over the term of the plan. The Debtors invoke their "cram down" power under 11 U.S.C. § 1325(a)(5)(B)(i) and propose to pay annual interest on the allowed secured claim at the rate of 9 percent. "Under the cram down option, the debtor is permitted to keep the property over the objection of the creditor; the creditor retains the lien securing the claim, *see* § 1325(a)(5)(B)(i), and the debtor is required to provide the creditor with payments, over the life of the plan, that will total the present value of the allowed secured claim, i.e., the present value of the collateral, *see* § 1325(a)(5)(B)(ii)." *Associates Commercial Corp. v. Rash,* —— U.S. ——, 117 S.Ct. 1879, 138 L.Ed.2d 148 (1997). In requiring that a chapter 13 plan provide for the payment of the present value of deferred payments to the holder of an allowed secured claim, Congress intended that debtors compensate the secured party for the decrease in value of its claim caused by delayed payment. *See In re Clark,* 168 B.R. 280 (Bankr. W.D.N.Y.1994).

■ In determining the appropriate rate of interest, the Court must first determine the allowed amount of the secured claim and then apply to that amount the appropriate interest rate to ensure that the present value of the payment stream will at least equal the allowed amount of the secured claim. *See* Keith M. Lundin, 2 *Chapter 13 Bankruptcy,* § 5.50, at 5–139–40 (Wiley 1995 & Supp.1996)(hereinafter referred to as "*Lundin* "). The Bankruptcy Code does not specify the appropriate interest rate for plans that exercise the present value option and, therefore, the interest rate issue has generated much litigation with contradictory results. Courts confronting the issue of the rate of interest to be paid under a cram down plan have adopted three approaches: 1) the "cost of funds" approach, i.e., the rate that the creditor would have to pay to borrow the amount of funds the debtor is repaying under the plan; 2) the "coerced loan" approach, i.e., the rate that the debtor would have pay a lender for a new loan to fund his plan under the particular circumstances of the case; and 3) the "market rate plus" approach, an objective interest rate with additional points depending upon the risk associated with a particular case. *See* Robert G. Quilia, *"Cramdown Interest Rate: Second Circuit Court of Appeals Addresses What It Is and What It Is Not,"* 6 J. Bankr.L. and P. 549 (July/August 1997).

In *In re Galvao,* 183 B.R. 23 (Bankr. D.Mass.1995), this Court had the opportunity to examine the appropriate rate of interest that should be used for determining the present value of a stream of payments to a secured creditor under § 1325(a)(5)(B). Upon consideration of the divergent views from various jurisdictions, the Court rejected those rulings that applied the contract rate, the straight market rate, the creditor-specific market rate, the T-bill rate, the prime rate, the judgment rate, as well as an absolute rule in all cases, and adopted a "market plus

---

**8.** For a discussion of the "coerced loan" approach, *see* pages 806 and 807, *infra.*

rate," to be determined on a case-by-case basis. *Id.* at 26–27.

The United States Court of Appeals for the Second Circuit recently adopted the "market rate plus" approach in determining the appropriate rate of interest to be paid by Chapter 13 debtors to a creditor whose claim was secured by a lien on the debtors' automobile. *In re Valenti*, 105 F.3d 55 (2nd Cir.1997). In *Valenti*, the Court of Appeals determined that the debtors must pay a market rate of interest, which it fixed as the rate on a United States Treasury instrument with a maturity date equivalent to the repayment schedule under the plan, *plus* a premium of one to three percentage points, to be determined by agreement of the parties or by the bankruptcy court, depending upon the debtors' circumstances, including prior credit history and the viability of the plan. *Id.* at 64. The court rejected the "forced loan" approach, stating the following:

> We believe that courts adopting the "forced loan" approach misapprehend the "present value" function of the interest rate. The objective of § 1325(a)(5)(B)(ii) is to put the creditor in the same economic position that it would have been in had it received the value of its allowed claim immediately. The purpose is *not* to put the creditor in the same position that it would have been in had it arranged a new loan. *See In re Dingley*, 189 B.R. [264] at 269 [Bankr.N.D.N.Y.1995](noting that courts favoring the forced loan approach "impermissibly recast present value 'so as to preserve the present value of the loan' as opposed to the secured claim").
>
> Moreover ... the value of a creditor's allowed claim does not include any degree of profit. There is no reason, therefore, that the interest rate should account for profit. *See id.* at 269; *see also In re Smith*, 178 B.R. 946, 951 (Bankr.D.Vt.1995)(distinguishing a creditor's "claim" under § 1325(a)(5)(B)(ii), which includes a statutory obligation to pay interest, from a loan, which "includes a contractual obligation to pay interest"); *In re Hudock*, 124 B.R. 532, 534 (Bankr. N.D.Ill.1991)( [T]he Bankruptcy code protects the creditors's interest in the property, not the creditor's interest in the profit

it had hoped to make on the loan."). Otherwise the creditor will receive more than the present value of its allowed claim. *See In re Cellular Info. Sys., Inc.*, 171 B.R. 926, 939 (Bankr.S.D.N.Y.1994).

*Id.* at 64. The court also disapproved of the "cost of funds" approach on grounds that it is unworkable in bankruptcy cases. It stated the following:

> [B]ecause individual creditors borrow funds at different rates, bankruptcy courts would have to conduct evidentiary hearings to determine a creditor's cost of funds on a case-by-case basis. In addition, bankruptcy courts using a "cost of funds" approach are likely to treat debtors inequitably. Chapter 13 debtors would be charged different interest rates depending upon how much their respective creditors have to pay for funds.

*Id.* at 65 (citations omitted).

■ For the reasons stated by the Court of Appeals in *Valenti*, this Court rejects as unfair and unrealistic the mortgagee's suggestion that the base rate should be the rate that a lender charges for loans of a similar character, which in this case would be a coerced five year loan to a class D borrower. A "coerced loan" loan interest rate is excessive. It unfairly enhances the position of and profit to the lender. If the mortgagee were granted relief from the automatic stay to foreclose on its collateral, it would simply reinvest the monies realized from its foreclosure at the prevailing market rate. In addition, a "coerced loan" rate prejudices the debtor's unsecured creditors by reducing the amount of the debtor's disposable income. Moreover, a "coerced loan" rate would drastically increase the failure rate for Chapter 13 cram down plans, thus undercutting the rehabilitative purpose of Chapter 13. This Court also rejects the "cost of funds" approach as one that would be impossible to consistently apply with any degree of predictability.

■ In determining the interest rate for plans exercising the present value option, most courts that construct a new interest rate for a cram down plan start with a rate based upon a risk-free loan and add a premium for risk.[9] *See In re DeMaggio*, 175 B.R.

9. Because the provisions of § 1325(a)(5)(B)(ii) are identical to the provisions of

144 (Bankr.D.N.H.1994); *In re Collins,* 167 B.R. 842 (Bankr.E.D.Tex.1994); *In re Westwood Plaza Apartments,* 147 B.R. 692, 701 (Bankr.E.D.Tex.1992). No uniform base rate has emerged in the reported cases. Some courts have applied the rate for U.S. treasury obligations, while others have applied the prevailing prime rate. *Compare United States v. Doud,* 869 F.2d 1144, 1145 (8th Cir.1989) *with In re Fowler,* 903 F.2d 694, 698 (9th Cir.1990).

■ In *Galvao,* this Court indicated that the base rate should correspond to a "similar loan in the market place in the region." However, as Judge Lundin points out, this cannot mean a similar loan extended to the debtor in a Chapter 13 case because "[t]here may be no such creature." *Lundin,* § 5.51, at 5–141. Indeed, the expert witnesses for both parties in this case agreed that a loan to a Chapter 13 debtor secured by mortgage on property with a 100 per cent loan to value ratio does not exist in the current lending market. The baseline rate should correspond to a risk free rate for loans secured by collateral similar to that which is the subject of the Debtors' cram down plan. Therefore, the treasury bill rate adopted by the *Valenti* court for motor vehicle loans should not apply to real estate mortgage loans as the collateral is not analogous. Thus, this Court defines the base rate as the current market rate for a loan similar to the original loan between the Debtor and the secured party that is now available to a reliable borrower with a good credit rating [10] as of the date of the confirmation. Such a rate better reflects current market conditions and strikes a more equitable balance between the competing interests of a debtor and a secured creditor.

■ Next, the Court must determine what adjustments to the base rate are appropriate in light of the *Galvao* factors. While the base rate reflects the current condition of the market and compensates the secured party for the loss of funds that it could invest elsewhere, the adjustments made to the base

rate adequately compensate the secured party for the forced nature of the extension of credit to Chapter 13 debtors, the 100 percent loan to value ratio, and the risks of additional defaults associated with a loan to a person with a poor credit record and a history of default. Thus, the Court may adjust the base rate through the application of various factors, including the type and value of the collateral, the terms of the plan, the debtor's financial history and prospects, the lender's risk factors and lost opportunity costs. 183 B.R. at 26. As Justice Stevens observed in his dissent in Rash, "[p]resent value includes both the underlying value and the time-value of [the creditor's] interest. The time value component similarly vitiates the risk concern. Higher risk uses of money must pay a higher premium to offset the same opportunity cost." *Rash,* —— U.S. at ——, n. *, 117 S.Ct. at ——, n. * (Stevens, J. dissenting).

■ In construing provisions of the Bankruptcy Code, courts should attempt to serve the goals of predictability and uniformity in deciding its governing standards. *See Rash,* —— U.S. at ——, 117 S.Ct. at ——. Accordingly, this Court will apply the two-part test in *Galvao* to determine the appropriate interest rate to be paid to secured creditors pursuant to § 1325(a)(5)(B) under Chapter 13 plans with a so-called "balloon payment" feature. The balloon payment feature is simply another risk factor that may result in an upward adjustment of the base rate.

■ In the present case, the Court shall take judicial notice of the average annual interest rate for 30–year fixed residential mortgages, which is currently 7.82 per cent. *See* Fed.R.Evid. 201(b), (c), and (f). To this base rate, the Court shall add one percentage point because of the Debtors' history of defaults in payment of the mortgage. The Court will add one point because of the substantial prepetition mortgage arrearage, which at the commencement of the Debtors' case was $25,000.00.[11] Additionally, the

---

§ 1225(a)(5)(B)(ii) and are similar to the provisions of § 1129(b)(2)(A)(i)(II), cases interpreting the requirements of chapters 11 and 12 are useful in determining the interest rate issue.

**10.** The witnesses for both parties referred to this type of borrower as a "Class A borrower."

**11.** As a rule of thumb in future cases, the Court will add .25 of a percentage point for every $5,000 of prepetition mortgage arrearage.

Court shall add one percentage point because of the Debtors' proposed balloon payment, which may increase FNMA's risk of not collecting its allowed secured claim should the Debtors default in their plan payments. In light of the testimony that the collateral is likely to appreciate, and because the duration of the plan is less than the original loan maturity date of 2019, the Court makes no further upward adjustment of the base rate. Accordingly, for the purposes of providing FNMA with the present value of its allowed secured claim, the Debtors must pay interest on that claim at the rate of 10.82 percent, rather than the 9 percent interest rate currently proposed under the Amended Plan.

## B. Balloon Payment Feature

The second issue presented is whether the Debtors' Amended Plan complies with the feasibility requirement of 11 U.S.C. § 1325(a)(6), which requires the Debtors to show they are "able to make all payments under the plan and to comply with the plan." The Amended Plan currently provides for payment $1,195.00 per month with a substantial lump sum at the conclusion of the plan term in the approximate sum of $39,500.00. In light of the Court's decision on the appropriate interest rate to be paid on FNMA's secured claim, see Part A, supra, the balloon payment feature of the Debtors' Plan must change. Assuming that the Debtors intend to maintain proposed monthly payments of $1,195.00, that FNMA has an allowed secured claim in the sum of $82,000.00, and that interest is paid at the annual rate of 10.82 per cent, the balloon payment will be $47,336.92.

The majority of courts does not reject balloon payment plans as unfeasible *per se* and instead carefully scrutinizes plans with balloon payment provisions on a case-by-case basis, reviewing a plan's feasibility based upon the totality of the circumstances. *See, e.g., In re Endicott,* 157 B.R. 255 (W.D.Va.1993)(order confirming plan reversed and remanded for further evidence and findings on debtor's prospects for refinancing); *In re Gregory,* 143 B.R. 424, 426 (Bankr.E.D.Tex.1992)("the inclusion of a balloon payment scheme in a plan is not dispositive of a plan's feasibility"); *In re Groff,* 131 B.R. 703 (Bankr.E.D.Wis.1991)(plan providing for balloon payment of $18,000 in 5 years confirmed where bank officer indicated willingness to refinance and debtors' income supported ability to make plan payments).

In *In re Brunson,* 87 B.R. 304, 312 (Bankr. D.N.J.1988), the court outlined a number of factors to be considered in determining whether a balloon payment plan had a reasonable likelihood of success: 1) the equity in the property at the time of filing; 2) the future earning capacity of the debtor; 3) the future disposable income of the debtor; 4) whether the plan provides for the payment of interest to the secured creditor over the life of the plan; 5) whether the plan provides for payment of recurring charges against the property, including insurance, local property taxes and utility charges; and 6) whether the plan provides for substantial payments to the secured creditor which will significantly reduce the debt and enhance the prospects for refinancing at the end of the plan. *Id.* at 312. In *In re Harris,* 199 B.R. 434 (Bankr. D.N.H.), Judge Vaughn applied the *Brunson* factors to a plan which amortized a $60,-000.00 secured claim over 15 years at an interest rate of 1 percent through payments of $644.77 per month over 60 months, and which further provided for a $48,792.00 balloon payment at the conclusion of the 5 year term of the plan. The court found that the debtor's plan was too speculative to be confirmed, and the prospect for refinancing unlikely because there would be less than 20 percent equity in the property at the conclusion of the plan and the debtor did not show any likelihood of increased future income. *Id.* at 436.

As feasibility is a fact driven concept, this Court rejects the view that balloon payment plans are *per se* unfeasible. Instead, the Court shall consider the propriety of a plan that proposes a final balloon payment based upon the totality of the circumstances, employing the *Brunson* factors.

In the present case, assuming that the Debtors amend their plan to pay interest at the rate of 10.82 percent, the Court is persuaded that a balloon payment in the approximate sum of $47,000.00 is not too speculative to be unconfirmable. Although the Debtors neither proved that they will

accumulate sufficient funds for payment of the balloon payment at the conclusion of the plan nor demonstrated the specific source of their proposed refinancing five years hence, they established by a preponderance of the evidence that there is a reasonable likelihood that they will be able to obtain refinancing. According to the Debtors' expert witness, in five years the Debtors' application for financing in the sum of the balloon payment likely will receive favorable consideration, so long as the Debtors comply with the provisions of their plan. Not only was this evidence unrebutted, FNMA's own expert agreed that the Debtors likely would obtain refinancing in two years if they complied with the terms of their plan. The plan provides for the payment of a substantial amount, approximately $70,000.00, over the term of the plan, which will reduce FNMA's debt, thus enhancing the Debtors' prospects for refinancing at the conclusion of the plan. Both expert witnesses testified that if economic conditions remain constant, the value of the Property will appreciate. There was no evidence that the Property will depreciate over the plan term. The Debtors intend to pay recurring charges against the property, such as real estate taxes, and to perform maintenance and repair work as needed. In five years, the Property will be worth at least, and probably more than, its current value of $82,000.00, and will be encumbered only by FNMA's lien in the approximate amount of $47,000.00. Thus, the loan to value ratio may be as high as 57 percent, which is well within the range of acceptability for residential mortgages granted by prospective lenders under conventional lending standards.

Applying the balance of the *Brunson* factors, the Court finds that the Debtors' future earning capacity is stable. Mr. St. Cloud and Ms. Jeudi have held their current positions for more than ten years and their employment appears to be secure. Both Debtors are likely to obtain cost of living adjustments and merit pay raises, such that their net disposable income will increase during the term of the plan. No evidence of any extraordinary expenses that would reduce the Debtors' projected future net income was introduced. Based upon the weight of the evidence that supports the stability of the Debtors' employment, the value of the collat-

eral, and the ability of the Debtors to make their installment plan payments, the Court finds that the Debtors' reorganization, premised upon their payment of FNMA's allowed secured claim of $82,000.00, with annual interest of 10.82 per cent and a balloon payment in the sum of $47,000.00, has a reasonable likelihood of success.

## IV. CONCLUSION

In accordance with the foregoing findings of fact and conclusions of law, the Court denies confirmation of the Debtor's Amended Plan and orders the Debtors to file by July 15, 1997 a Second Amended Plan which contains provisions consistent with the findings made in this Memorandum. The Court overrules FNMA's objections without prejudice to renewal in the event that the Debtor's Second Amended Plan fails to comport with this Memorandum.