**In re Mark J. GILLIS, Debtor.**

No. 04–18893–RS.

United States Bankruptcy Court,
D. Massachusetts.

Oct. 14, 2005.

John Ullian, Esq., for Debtor.
Deirdre Kendy, Esq., for MERS.

Doreen Solomon, Esq., Chapter 13 Trustee.

## MEMORANDUM OF DECISION AND ORDER ON OBJECTION OF MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. TO CONFIRMATION OF CHAPTER 13 PLAN

ROBERT SOMMA, Bankruptcy Judge.

The Debtor, Mark J. Gillis, has proposed a Chapter 13 plan that would, among other things, cure a $38,000 arrearage on his home mortgage. He would fund the $93,430 cost of the plan largely through a balloon payment of $75,930.00, to be paid upon the refinancing or sale of his home in the last month of this 36–month plan. The mortgagee, Mortgage Electronic Registration Systems, Inc. ("MERS"), has objected to confirmation of the plan, arguing that Chapter 13 prohibits balloon payments in "cure and maintain" plans as a matter of law. For the reasons set forth below, the Court disagrees and, finding that the plan is permitted and feasible, and that it cures the arrearage to MERS within a reasonable time, now overrules the objection.

### Procedural History

The Debtor filed a petition for relief under Chapter 13 of the Bankruptcy Code on November 3, 2004, thereby commencing this case. With his petition, he filed a Chapter 13 plan having a term of thirty-six months. Among other things, the plan provides that the Debtor will cure an arrearage quantified at $38,000 on a mort-

gage held by MERS[1] and that the Debtor will continue to make regular monthly payments on the mortgage directly to the mortgagee. The plan makes provision to pay secured debt totaling $40,170 (all arrearages), priority claims totaling $32,982, an administrative claim of $1,109, and a ten percent dividend on unsecured debt of approximately $90,000. The total cost of the plan, including the fee to the Chapter 13 Trustee, is $93,430. The plan states that the Debtor will fund this sum by making monthly plan payments of $500 per month for 35 months and a lump-sum ("balloon") payment of $75,930 in the thirty-sixth month. The Debtor would fund the balloon payment by refinancing his home (the property subject to the MERS mortgage) or, if necessary, selling the same property.

MERS filed an objection to the plan, stating that the balloon feature "is an impermissible modification of the claim" and unfairly delays payment of half the arrearage until the thirty-sixth month with no additional compensation. MERS also argued that the Debtor had not shown that the balloon payment was feasible or justified.[2] In a subsequent brief in support of its provision, MERS expanded on these initial statements with four specific arguments of law. First, as a matter of law, a debtor who cannot repay his or her prepetition claims without a balloon payment is not an "individual with regular income" within the meaning of § 101(30) for the purposes of qualifying as a Chapter 13

---

1. The plan identifies the mortgagee as Chase Manhattan, but the Debtor does not disagree that MERS is the current holder of the mortgage. Also, though the plan quantifies the arrearage at $38,000, MERS has filed a proof of claim which states that the arrearage is $39,958.60; nonetheless, MERS has not objected to the plan's quantification of the arrearage.

2. The United States, by the Internal Revenue Service, also objected to the plan, stating that the plan did not make provision for the full amount of its claim; notably, the IRS contends that its priority claim exceeds the plan's quantification of that claim by approximately $10,000. A preliminary hearing on that objection was continued generally at the parties' request and remains pending.

debtor. Second, balloon payments in standard "maintain and cure" plans[3] violate § 1322(d) (prohibiting payments over longer than three years or, for cause, up to five years). Third, balloon payments in maintain and cure plans fail to satisfy the feasibility requirements of § 1325(a)(6). And fourth, balloon payments in maintain and cure plans violate § 1322(b)(5) itself, the subsection that permits curing of any default within a reasonable time and maintenance of payments while the case is pending. In response, the Debtor's position is simply that the Bankruptcy Code does not categorically preclude reliance on balloon payments and that the proposed balloon payment in his plan is feasible.

After a preliminary hearing on the objection, the Court received briefs on the legal issues and held an evidentiary hearing. At the Court's request, the parties also filed an agreed statement as to the precise amount owed on the mortgage to MERS.

### Findings of Fact

The Debtor and his wife, who is not a debtor in this case, own the real property located at 237 Forest Street, Reading, Massachusetts ("the property"), a single-family home in which they reside with their three young children. The Debtor and his wife acquired the property in October 1994 for the price of $234,000. In 2002, they commenced a significant remodeling project on the home that they had expected would cost $142,000. The project is now completed, but unanticipated events and complications increased the cost to approximately $300,000. Compounding the couple's difficulties, in October 2002, the Debtor's wife lost her full-time job, in which she had been earning $49,000 per year. Despite these setbacks, they managed to refinance their home in November, 2003, with a mortgage loan (the mortgage now held by MERS) in the original principal amount of $536,200.00. Still, the increased cost of the renovation project and the loss of the wife's income landed the couple in financial distress. The Debtor explained, "I was faced with the Hobson's choice of either paying Chase or paying contractors to make my house liveable for my family." They paid the contractors and got the project finished but, in doing so, fell significantly into arrears on their mortgage payments; their loan agreement required monthly payments during that period in the amount of $4,435.80. By the time of the bankruptcy filing in November 2004, the couple was $39,958 in arrears on their mortgage[4] and facing foreclosure.

The Debtor estimated that the fair market value of the property was $780,000 at the time of his bankruptcy filing and, with postpetition appreciation, $800,000 as of the date of the hearing (May 5, 2005). Though he is not a real estate appraiser, he is well-informed about his own property, property values in the Town of Reading in general, and trends and factors in that market. His estimate is based in part on an appraisal commissioned by the mort-

3. MERS is referring to a plan that treats a claim secured only by a mortgage on the debtor's principal residence in accordance with 11 U.S.C. § 1322(b)(5). In relevant part, that subsection states that, notwithstanding § 1322(b)(2)'s prohibition against a plan's modifying the rights of those secured claims secured only by a security interest in the debtor's principal residence, "a plan may ... provide for the curing of any default [on such a claim] within a reasonable time and mainte-

nance of payments while the case is pending." 11 U.S.C. § 1322(b)(5).

4. The Debtor's Chapter 13 plan quantifies the arrearage at $38,000. In its objection to confirmation, MERS does not dispute that figure. At the evidentiary hearing on the objection, however, the parties stipulated that, as of the date of the filing, the arrearage was $39,958.60.

gage broker through whom he obtained the MERS mortgage; under that appraisal, the fair market value of the property was $705,000 in September, 2003. Though that appraisal is not itself in evidence, I find the value it settles upon to be consistent with the decision by MERS's predecessor in interest to lend $536,000 against that property some two months later. Therefore, I accept the figure of $705,000 as a reasonable and trustworthy benchmark for the fair market value of the property in the fall of 2003.

The Debtor further testified that, when the appraisal was conducted, the renovation of the property was incomplete, and that another $48,000 of work was done afterward, further increasing the property's value to approximately $750,000 upon completion of the renovations in early 2004. The Debtor then adjusted the value upward to $780,000 and $800,000 in conformity with the general increase in real estate values in the metropolitan Boston area over the last year.

MERS offered no evidence of its own on value and has not taken a position on the issue. MERS cross-examined the Debtor with respect to his evidence of value but exposed no weakness in it. That evidence was fundamentally sound, as was the valuation it supports; accordingly, I find that the fair market value as of the date of the bankruptcy filing was $780,000.

The property is encumbered only by the mortgage in favor of MERS, on which the balance owing is $600,511.93 (as of May 5, 2005). The Debtor has fallen into arrears on his real estate tax obligations, but MERS has made advances to cover that arrearage, and those advances are reflected in MERS's secured claim. There is no evidence of a separate lien in favor of the Town.

Therefore, MERS is protected by an equity cushion of at least $180,000 as of the date of the bankruptcy filing. This cushion is likely to increase postpetition with appreciation in the value of the property (attributable entirely to the general and continuing trend in housing values in this area) and with modest reduction in the debt from payments on the arrearage through the plan and, to a lesser extent, from regular postpetition payments insofar as they are allotted to principal.

The Debtor, a self-employed attorney, averages income of approximately $7,826 per month (after business expenses). His income is secure and likely to hold steady or to increase modestly over the term of the plan. Though secure, the Debtor's income is nonetheless somewhat erratic, owing to the irregular payment schedule of the governmental entities who pay for, or authorize payment for, his services and thereby represent a substantial portion of his income. Because his income is irregular, the Debtor has historically relied on savings or reserves to enable him to remain current with creditors while awaiting income from his account debtors. The events that precipitated his bankruptcy filing have depleted his reserves, and consequently the Debtor temporarily fell into arrears on his payments to the Chapter 13 Trustee, but now has cured the arrearage. As reserves slowly increase again, the Debtor's postpetition payments to the Trustee and to MERS will likely become regular.

The Debtor's wife is now employed part-time as an independent sales consultant, earning $774 per month ($180 per week). Total monthly household income is therefore $8,600. The Debtor and his wife have reasonable and necessary monthly expenses of $8,100, leaving excess income of $500 per month to devote to the Chapter 13 plan. They do not anticipate a substantial change in this situation over the three-year term of the plan, except that the

Debtor's wife expects to return to full-time employment in the fall of 2006, when the couple's youngest child starts kindergarten.

In order to complete their Chapter 13 plan, the Debtors will have to pay the balance owing on the plan in its thirty-sixth month, $75,930.[5] In order to finance this payment, they will have to refinance their home which will in turn require payment in full of the MERS mortgage. Payment in full of the mortgage balance will include payment of the $38,000 arrearage, which is also part of the cost of the plan and should not be paid twice. Therefore, the total that the Debtor will have to borrow is the balance owing on the mortgage ($600,511.93 [6]), plus the balance then owing on the plan ($75,930) less the amount of the arrearage as quantified by the plan ($38,000): a total borrowing of $638,441.93.

The Debtor presented credible evidence, the testimony of a mortgage broker who specializes in loans to Chapter 13 debtors, that financing is available for Chapter 13 debtors seeking to refinance their homes in order to complete their Chapter 13 plans, provided they meet three requirements. First, the amount of the loan being sought must not exceed eighty-five percent of the value of the property securing it (the "loan-to-value requirement"). Second, the amount of the monthly payment required by the loan, together with the monthly burden of property taxes and insurance, must not exceed fifty percent of the borrowers' gross monthly income. Third, the borrowers must have made payments on their existing mortgage on a

timely basis throughout the twelve-month period immediately preceding qualification for the loan. A loan under this program would be a thirty-year loan having a rate of interest that is fixed in the first two years and variable thereafter. The rate in the first two years would be fixed at one percentage point lower than what would be available on a thirty-year fixed rate loan.

The Debtor has established that he will likely be able to satisfy the loan-to-value requirement. For a refinancing in the amount of $638,441.93, this requirement will be satisfied if the fair market value exceeds $750,807.71. The property already exceeds that value and will likely appreciate further over the term of the plan.

The second requirement for mortgage qualification was that monthly principal, interest, taxes, and insurance (PIT & I) not exceed fifty percent of the borrowers' gross monthly income. With respect to income, the Debtor and his wife currently have gross monthly income of $8,600. This figure includes the Debtor's wife's income from part-time employment of $774 per month. The Debtor's wife intends to return to full-time work in the fall of 2006. Before losing her full-time job in the fall of 2002, he had been employed as the senior writer in the marketing department at Blue Cross/Blue Shield, earning $49,000 per year. It is reasonable to expect that she will return to that salary level before the summer or fall of 2007, when the couple applied for the financing needed to fund the balloon payment. Even if she

---

5. This balance, $75.930, equals the total cost of the plan, $93,430, minus the sum of the monthly payments required in the interim, $17,500 (35 monthly payments of $500).

6. This amount may have to be adjusted to reflect (1) postpetition reductions in principal (from regular monthly postpetition payments to MERS over the term of the plan), (2) pay-

ments on the arrearage through the plan, and (3) postpetition charges for MERS's attorney's fees and other costs. Absent significant attorney's fees, which are unlikely here, the net effect will be a modest reduction of the balance, and therefore the figure cited is conservative.

only earned $40,000 per year ($3,333.33 per month) in he full-time employment and the Debtor's own income of $7,826 did not increase at all—conservative estimates both—monthly household income would total $11,159.33.

Under the loan program of which the Debtor submitted evidence, this would permit the couple to qualify for monthly payments of PIT & I totaling up to $5,580 (50% of $11,159.33). The Debtor submitted uncontroverted evidence that real estate taxes on the property are currently $600 per month and that property insurance currently costs $500 per year, or $42 per month. Therefore, taxes and insurance together currently total $642 per month; adjusting for inflation over the three years of the plan, these would total approximately $700 by the time of the refinancing, leaving $4,880 for principal and interest.

Would this permit the Debtor and his wife to borrow the $638,441.93 that would be needed to pay off the MERS mortgage and make the balloon payment on the plan? The loan in question would involve borrowing $638,441.93 and repaying it over thirty years with a fixed rate in the first two years and a variable rate thereafter. The Debtor presented evidence that applicants under this program were currently being approved for refinancing at initial interest rates of 6.3 and 6.5 percent per annum. At 6.5 percent, monthly payments on a 30–year loan of $638,441.93 would be $4,035.38; at 7.5 percent, $4,464.07; at 8.25 percent, $4,796.40; and at 8.5 percent,

$4,909.06. I conclude that the Debtor and his wife a reasonably likely to be able to satisfy the program's payment-to-income ratio.

### Discussion

MERS makes four arguments as to why confirmation of the proposed plan should be denied as a matter of law. The Court will first address these four as challenges to balloon plans in general and, with respect to the challenges under § 1325(a)(6) (feasibility) and § 1322(b)(5) (reasonable time to cure), as challenges to this particular balloon plan.

### 1. The "Regular Income" Test

■ In order to qualify for relief under Chapter 13 of the Bankruptcy Code, a debtor must be "an individual with regular income." 11 U.S.C. § 109(e) (eligibility to be a debtor under Chapter 13). In relevant part, the Bankruptcy Code defines "individual with regular income" as "individual whose income is sufficiently stable and regular to enable such individual to make payments under a plan under chapter 13 of this title." 11 U.S.C. § 101(30) (definition of "individual with regular income"). MERS first argues that 11 U.S.C. § 109(e), in limiting eligibility for Chapter 13 to an individual "with regular income," actually requires not only that the Debtor have stable and regular income, but that such regular and stable income be sufficient in amount to fund the plan without recourse to supplemental sources of funding.[7]

---

7. The cases that MERS cites in support of this proposition are inapposite. Each involved a plan that relied exclusively on future earnings or other income without recourse to a balloon payment. See In re Hickman, 104 B.R. 374 (Bankr.D.Colo.1989) (plan that relied solely on flow of income was unconfirmable because income flow was neither reliable nor reasonably certain as to amount) and In re Fischel,

103 B.R. 44, 49 (Bankr.N.D.N.Y.1989) (monthly plan contributions from unrelated third party deemed too tenuous to satisfy stability requirement of § 109(e)). Confirmation was denied in these cases because future income, which was the only source of funding in each case, was not sufficiently reliable and regular to enable the debtor to make the payments required to fund the plan. These

■ This argument reads more into § 109(e) than it says. Subsection 109(e), in conjunction with the definition in § 101(30), requires that a Chapter 13 debtor have income that is sufficiently stable and regular to enable the individual to make payments under a plan. Although the definition in § 101(30) contemplates "payments under a plan," in no way does it dictate how large those payments need be It does not say "*all* payments under a plan." In fact, if § 109(e) were construed as MERS now proposes, it would directly contradict § 1322(b)(8) of the Bankruptcy Code, which expressly permits a Chapter 13 plan to "provide for the payment of all or part of a claim against the debtor from property of the estate or property of the debtor." 11 U.S.C. § 1322(b)(8). The Court is satisfied that the requirement of regular income in § 109(e) is not a mandate that the debtor's income be sufficient in *amount*, by itself, to fully fund the plan (or any specific portion then of).

### 2. *Section 1322(a) and (d)*

■ MERS next argues that subsections 1322(a) and (d) show a legislative intent not to permit balloon payments. Specifically, Congress mandated that all of a Debtor's projected disposable income be devoted to a plan for a period of three years, and permitted extension of this period to five years upon a showing of cause. 11 U.S.C. § 1322(a) and (d). The ability to repay by a balloon payment, contends MERS, defeats the purpose of the extension permitted by § 1322(d). MERS further argues that the requirement in § 1322(a) that all of a debtor's disposable income be devoted to the plan precludes the possibility of the debtor's saving money over the term of the plan.

Again, MERS is reading more into the language of § 1322(a) and (d) than these subsections actually and plainly say. None of the language in either subsection prohibits alternate sources of plan funding; nor does such language expressly or implicitly require that *all* plan funding be derived from wages and salary. Subsection (a) requires submission of "future earnings *or other future income.*" 11 U.S.C. § 1322(a)(1). A gain from sale or refinancing of property is income within the scope of this section. Moreover, even if the excess proceeds of a refinancing were not income within the scope of § 1322(a)(1), that subsection requires submission of only such future earnings or income "as is necessary for the execution of the plan." To the extent that the plan is funded from other sources, such as the sale or refinancing of property, future earnings and income are not necessary for the plan's execution and, consequently, not required by § 1322(a)(1). As for subsection (d), it merely permits extension of the plan period for cause. It plainly does not prohibit funding of the plan from sources other than wages and salary. Especially in view § 1322(b)(8) (permitting payment of claims from assets of the estate and of the debtor) it does not evince congressional intent to preclude funding from sale or refinancing of assets.

### 3. *Feasibility under § 1325(a)(6)*

■ MERS next argues that the feasibility requirement in § 1325(a)(6) is one that a balloon plan, by its nature, can *never* satisfy. Section 1325(a)(6) permits confirmation of the plan only if the debtor will be able to effectuate it, to make the payments it requires. A balloon plan is inherently based on the supposition that

cases did not address the issue presented here: whether § 109(e) requires that future income be sufficient in amount to fund the plan without recourse to a balloon payment from sale or refinancing of assets.

there will be sufficient equity in the property at the end of the plan term, three to five years from commencement of the case, to permit the sale or refinancing necessary to fund the plan. But no one can know the economic future, MERS points out, and history has in recent memory known downturns in real estate values. Therefore, MERS concludes, a balloon plan can never be shown to have the "reasonable likelihood of success" that case law has adopted as the measure of feasibility in § 1326(a)(6).[8]

■ Section 1325(a)(6), the feasibility requirement, permits confirmation of a Chapter 13 plan "if the debtor will be able to make all payments under the plan and to comply with the plan." 11 U.S.C. § 1325(a)(6). Case law has not construed this subsection as requiring *certainty* that the debtor will be able to make the plan payments. Rather, as MERS concedes, it requires a showing only that the plan has a "reasonable likelihood of success." *First Nat'l Bank of Boston v. Fantasia (In re Fantasia)*, 211 B.R. 420, 423 (1st Cir. BAP 1997) (where plan relied on balloon payment, BAP rejected absolute certainty as impossible standard of feasibility and settled instead on reasonable likelihood of success, to be established by definite and credible evidence of ability to make the balloon payment).

■ In arguing that balloon plans fail as a matter of law, MERS attempts to prove too much. Balloon plans and their circumstances vary widely. Some can pass the test; MERS itself suggests that the pres-

ent plan would itself be acceptable if its duration were only six months. Though many balloon plans are vulnerable to feasibility challenges, they do not fail this test *as a matter of law. Id.* (inclusion of a balloon payment is not dispositive of a plan's feasibility); *In re St. Cloud,* 209 B.R. 801, 809 (Bankr.D.Mass.1997) (balloon payment plans in Chapter 13 are not per se unfeasible); *In re Wagner,* 259 B.R. 694, 700 (8th Cir.BAP2001) ("A plan is not infeasible per se because a debtor proposes a lump sum payment."). As MERS concedes, feasibility is a fact-based determination. The Court must examine the feasibility of each balloon plan on its own facts.

■ The Court finds that the present plan is feasible. It can succeed either by refinancing or by sale of the property. Refinancing, the more difficult option, requires the confluence of several factors: the Debtor must achieve regularity in his plan and mortgage payments for a period of twelve months before the term of the plan; his wife must find full-time employment at a suitable salary; interest rates must not increase prohibitively over the term of the plan; and real estate values must not drop prohibitively. None of these is assured, but each separately, and all together, are reasonably likely to occur; that is, refinancing is feasible. Sale of the property, which is the Debtor's fall-back option, requires only a willing buyer at a price in excess of the $670,000, which would cover the $638,441.93 necessary to pay off the mortgage and plan and pay a broker's five percent sales commission.

---

8. Under this same heading of feasibility, MERS also argues that the inherent uncertainty of future real estate values causes balloon plans to suffer two further problems. First, they shift the risk of loss entirely to the creditor; and second, they raise the specter that, should real estate values drop below the amount of the mortgage debt, the debtor will dismiss his "cure and maintain" case and file a new case in which he proposes to cramdown the mortgagee. While these are real concerns, they are not concerns of feasibility but of adequate protection of the secured debt and protection against abuse. The Court will address them separately below.

Even allowing for substantial slippage in real estate values, this is well within the realm of feasibility.

### 4. *Curing of Default and Maintenance of Payments under § 1322(b)(5)*

Notwithstanding § 1322(b)(2)'s prohibition against a plan's modifying the rights of those secured claims secured only by a security interest in the debtor's principal residence, "a plan may ... provide for the curing of any default [on such a claim] within a reasonable time and maintenance of payments while the case is pending." 11 U.S.C. § 1322(b)(5). MERS contends that, as a matter of law, a balloon payment cannot satisfy the requirement that the curing of the default occur within a reasonable time. MERS further contends that timing of the cure payments in this plan, where the Debtor would make "minimal" payments for thirty-five months and pay the bulk of the arrearage only in the thirty-sixth month, is prejudicial and inequitable to MERS and therefore does not satisfy requirement of cure within "a reasonable time." MERS does not explain how the plan is prejudicial or inequitable.

 The Court first rejects the argument that balloon payments, as a class, cannot satisfy the cure-within-a-reasonable-time requirement. Again, balloon plans and their circumstances vary widely. "A reasonable time is a discretionary standard that will vary from case to case, according to the particulars and circumstances of the plan." [9] It simply is not the case that no plan that relies in part on a balloon payment to cure a default can conceivably satisfy the requirement of "reasonable time." Balloon plans do not fail

the reasonable time test as a matter of law.

 This leaves the question of whether the proposed cure period in this case is unreasonable. The Court holds that it is not unreasonable and, in doing so, is guided by the following considerations.

First, the plan effectuates a cure just as quickly as the Debtor and his wife can feasibly effectuate one. They have submitted all their disposable income to the plan. And they propose to refinance the property by the thirty-sixth month of their plan because the option of refinancing is not likely to be available to them much sooner than then. Without question, the plan represents the Debtor's best effort.

If the Debtor and his wife were to fund the plan, or even just the arrearage, entirely from future earnings (as MERS suggests they should), the process would be considerably longer. The arrearage in this case is especially large and the total cost of the plan substantially larger. Even with considerably more disposable income than they presently have, the Debtor and his wife could not cure the arrearage and fund the plan exclusively from such disposable income in less than the maximum sixty months that the Code affords Debtors "for cause." 11 U.S.C. § 1322(d). By contrast, the present plan provides for full cure within thirty-six months.

I am not swayed by the fact that the Debtor and his wife could have elected to sell the property immediately in order to fund a balloon payment in the early months of the plan. They want to keep their home. This is understandable and not unreasonable; the principal attraction and purpose of Chapter 13 is that it en-

9. The Bankruptcy Code provides no guidance as to what constitutes a reasonable time to cure a default on a residential mortgage. Nor has the case law settled on a widely-accepted definition. See Keith M. Lundin, CHAPTER 13 BANKRUPTCY, 3D ED. § 133.1 (2000 and Supp. 2004).

ables debtors to do just this. The option of an immediate sale would undercut the plan and its legitimate purpose. Accordingly, I hold that where a debtor has a justifiable interest in keeping his or her home, a cure period is not rendered unreasonable solely because a cure could be effectuated sooner through an immediate sale. For these reasons, I am satisfied that the time to cure under the plan is no longer than is necessary to effectuate a cure.

Second, MERS's secured claim is adequately protected during the term of the plan by a sizable equity cushion and by the right of MERS to seek relief from stay during the pendency of the case should circumstances change. The size of MERS's equity cushion is likely to increase postpetition with appreciation in the value of the property and with modest reduction in the debt. Also, the Debtor's obligation to remain current on postpetition real estate taxes should prevent erosion of MERS's cushion by a senior statutory lien. Therefore, although no one can predict with certainty the future value of this property, MERS is adequately protected: the length of the cure period, and the delay occasioned thereby, do not jeopardize the mortgagee's ability to recover the arrearage (or the debt as a whole) by recourse to its collateral.

Third, and contrary to what MERS suggests, the duration of this plan does not shift all risk of loss to MERS. In view of the substantial equity that the Debtor and his wife now have in the property (which equity is fully exempt under the Massachusetts homestead exemption), the risk of loss here is borne more heavily by the Debtor and his wife than by MERS. Their equity would be first to disappear should

real estate values drop over the term of the plan. And the postpetition income that they are devoting to the plan and to the servicing of the MERS loan postpetition is income they would be expending otherwise were they not betting on the success of this plan. MERS may take little comfort in this, but the Debtors are not embarking on this plan without risk to value of their own. Insofar as risk and its allocation are concerned, the plan's thirty-six month cure period does not unreasonably or unfairly impose on MERS.

Fourth, though the proposed monthly payments of $500 will fund only 18.7 percent of the cost of the plan and (assuming pro rata allocation) of the cure, they are not nominal or insubstantial.

And fifth, should the plan not succeed, or should the Debtor dismiss this case before completion of the plan, MERS will retain its mortgage and be able to foreclose. Especially in view of the impending changes in the Bankruptcy Code, there is little likelihood that a repeat filing would substantially delay a foreclosure after dismissal. The potential for abuse here is similarly small.

The Court concludes that in the circumstances of this case, the proposed cure period is reasonable within the meaning of § 1322(b)(5). The Court is further satisfied that, insofar as MERS has indirectly challenged the plan on the basis that it does not adequately protect MERS's secured claim against diminution in value,[10] the Debtor has carried his burden of proof on the issue and demonstrated that MERS's secured claim is adequately protected.

---

10. MERS makes no normal objection on the basis of lack of adequate protection, but adequate protection considerations clearly in-

form its objection under § 1322(b)(5) and its argument in general.

## ORDER

Having now rejected each of the arguments set forth by MERS in support of its objection to confirmation, the Court hereby overrules the objection of MERS to confirmation of the plan.